# United States Court of Appeals
## For the First Circuit

No. 99-1453

JASON DAVIS,

Plaintiff, Appellee,

v.

PAUL RENNIE, RICHARD GILLIS, MICHAEL HANLON, LEONARD FITZPATRICK,
NICHOLAS L. TASSONE, and JOYCE WIEGERS,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker, Senior U.S. District Judge]

Before

Selya, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lipez, Circuit Judge.

Christopher M. Perry, with whom Brendan J. Perry, Terance P. Perry, and Brendan J. Perry & Associates, P.C., were on brief, for appellee.
Howard R. Meshnick and James A. Sweeney, Assistant Attorneys General, with whom Thomas F. Reilly, Attorney General, was on brief, for appellants.

September 5, 2001

**LIPEZ, Circuit Judge.** Jason Davis, an involuntarily committed mental patient, brought suit under 42 U.S.C. § 1983, the Massachusetts Civil Rights Act, and other statutes against multiple defendants after being punched repeatedly in the head during a physical restraint at Westborough State Hospital. A jury awarded Davis $100,000 in compensatory damages and $1.55 million in punitive damages, concluding that the appellants violated Davis's substantive due process rights under the Fourteenth Amendment. Joyce Wiegers, the head nurse who ordered the restraint, and Leonard Fitzpatrick, Richard Gillis, Michael Hanlon, Paul Rennie, and Nicholas L. Tassone, mental health workers who participated in the restraint, appeal the portion of the judgment against them. They argue that the district court erred in instructing the jury about Davis's claims; that there is insufficient evidence for a reasonable jury to have found that they violated Davis's constitutional rights; that they are entitled to qualified immunity; and that the evidence does not support a punitive damages award. We affirm the judgment against each of the appellants.

## I.

Although we must assess challenges to the sufficiency of the evidence in the light most favorable to the verdict, Cigna Ins. Co. v. Oy Saunatec, Ltd., 241 F.3d 1, 6 (1st Cir. 2001), we recount some of

the factual disputes at trial to provide a more complete sense of the issues before the jury.

At the time of the events relevant to this case, Jason Davis, 28 years old, suffered from schizo-affective and bipolar disorders. He had a history of substance abuse and suicide attempts and had been hospitalized between 10 and 12 times since the age of 17. He was involuntarily committed to Westborough State Hospital (Westborough) for periods during 1991 and 1992. After threatening to kill his father, he was committed to Westborough for a third time on May 12, 1993. Davis spent about a month in Westborough's Hennessey Building, a locked wing of the hospital, and then transferred to Chauncy Hall, an unlocked wing.

On August 12, 1993, Davis and another patient, Dean Dexter, violated hospital rules by leaving the grounds without permission. Davis testified that he told Dexter that he was unhappy because no one had visited him on his birthday two days earlier, and that Dexter suggested that they go drinking. The patients walked to a nearby liquor store and bought beer, vodka, and wine coolers. At about 11 a.m., Davis and Dexter went into the woods behind the store and began drinking.

Westborough staff sent Greg Plesh, a special state police officer assigned to the hospital for security, and Frantz Joseph, a mental health worker (MHW), to look for the missing patients. While

Joseph watched for Davis and Dexter on the road next to the liquor store, Plesh went into the woods, where he found the patients. Davis and Dexter did not threaten Plesh or resist when he asked them to walk back to his car with him. At the car, Plesh and a second police officer handcuffed Davis and Dexter and took them back to Chauncy Hall with Joseph. There, medical staff decided that the patients should be medically evaluated in a more secure unit because they had been drinking. The staff instructed Plesh, Joseph, and the second police officer to take the patients to Hennessey Unit 2A.

Plesh and Joseph arrived with Davis and Dexter at Hennessey at about noon. Plesh took off the patients' handcuffs in the lobby, as policy required. According to Plesh, who is Davis's key witness, Davis and Dexter were loud and boisterous as they rode the elevator up to Hennessey 2A. When they arrived at the unit, Head Nurse Joyce Wiegers told Plesh to take Davis and Dexter to the day hall. Wiegers had not received notice from Chauncy Hall that Davis and Dexter were coming. As Head Nurse for Hennessey 2A, Wiegers was responsible for 37 patients and several staff, about half of whom were outside on a picnic.

Wiegers told Davis and Dexter to stay in the day hall while she called a doctor to evaluate them. According to Plesh and Davis, Dexter came out of the day hall after a few minutes and made sexually inappropriate comments to a second nurse, Sheila Mall. Plesh said that Mall got upset and called to Wiegers, who sent Dexter back to the day

-4-

hall and asked Plesh to stay with the patients until male MHWs could be called in from the picnic. Plesh said that Dexter and Davis were "loud and demanding" and that there was "continuing escalation" between the patients and the nurses.

MHWs Phillip Bragg, Michael Hanlon, and Paul Rennie responded to Wiegers's call for assistance. Wiegers, Bragg, and Hanlon testified that as the MHWs stood at the door of the day hall, Davis smacked one hand with his fist and said things like "I'll kill you" and "I'll break your neck" while looking at the MHWs. Davis denied this account and testified that Dean Dexter made the verbal threats and threatening gestures to the MHWs.

Wiegers directed Bragg, Hanlon, and Rennie to separate Dexter and Davis by putting Davis in the unit's "quiet room," which had a mattress on the floor, and Dexter in the "four-point room," which had a bed with four-point mechanical restraints. Each patient was to be secluded with the door left open and an MHW stationed outside. The MHWs took Davis to the quiet room without incident. Once inside, they asked him to take off his belt and shoes, as policy required. Hanlon, Wiegers, and Bragg testified that Davis threw the belt at Hanlon and hit him in the chest. Plesh, who was watching from the hallway, said that the belt might have hit one of the MHWs by rebounding after Davis threw it at the wall. Davis denied throwing the belt at Hanlon.

Although Wiegers told Plesh and Joseph that they could leave,

-5-

she said they should be prepared to return if necessary. Hanlon and Rennie stood outside the open door of the quiet room. Bragg was also standing in the hallway. Davis testified that Bragg and Rennie "were laughing, making comments about the facts that we were idiots or something or drunks. They just thought the whole thing was funny." Davis said that when he asked the MHWs if he could leave the room to smoke, Rennie said "you are going to have to go through us," and "what do you think that you're going to do? Are you going to kick our ass?" Rennie denied making these comments. Davis said that he considered Rennie a friend and that Rennie was acting "like he was someone else," which upset him.

In response to his lawyer's questions about how Rennie's comments made him feel, Davis said: "I did something really stupid. I turned around to the wall and tried to do a double drop kick." Davis testified that he tried to kick twice and executed poorly, and that Bragg and Rennie "were laughing, saying that I looked like a toad." Davis said that his back was to Rennie when he attempted the kicks, and that he "just aimed towards the wall." Hanlon also said that Davis's kicks did not connect with anyone, though he characterized them as threatening. Rennie testified that the kicks were directed at him and that one kick hit his arm. With Hanlon standing by, Rennie physically restrained Davis. The restraint did not injure Davis. However, Davis testified that Rennie choked him and threw him to the

mat with "deadly force."

At this point, Wiegers called a "green alert stat" asking any available male staff to come to Hennessey 2A. Plesh responded, as did MHWs Fitzpatrick, Gillis, Tassone, and Jeffrey Flowers. When they arrived, Davis was sitting on the mattress in the quiet room. Wiegers told the MHWs to take Davis to the four-point room and put him in mechanical restraints. Tassone, who knew Davis well from an earlier admission to Hennessey, talked to the patient and the two agreed that Davis would walk to the four-point room himself rather than be carried in by the MHWs. Davis got up from the mattress and walked through the door of the quiet room with Hanlon ahead of him, Tassone on one side, and Rennie behind. Plesh and Bragg were in the hallway and Gillis and Fitzpatrick were still in the quiet room. Plesh testified that as Davis walked out of the room, Bragg "got right in Jason's face and made a comment to Jason." Plesh did not hear what Bragg said. Bragg denied making any comment to Davis. Davis said that after the take-down in the quiet room, Rennie taunted Davis by saying "I thought you were tough," and that in response as they walked into the hallway Davis spun and kicked Rennie hard in the stomach. Davis said about his decision to kick Rennie: "There was no way I was going to let him strap me to that bed. There was no way I was going to let that continue. But at the same time there was like no way out."

Davis's kick sent Rennie to the floor. Bragg, Fitzpatrick,

Gillis, Hanlon, and Tassone began trying to physically restrain Davis. Plesh, who characterized himself as an "extra male" at the scene, watched from a few feet away. Wiegers testified that she was "back and forth constantly" and "would be gone maybe for seconds" as she tried to monitor the restraint of Davis as well as ensure the safety of the other patients on the floor. Davis struggled, and Wiegers said she saw "a pile of bodies" as the MHWs took him to the floor. According to testimony at trial, Bragg was at Davis's head with one knee on either side, Fitzpatrick, Gillis, and Rennie, who had rejoined the restraint, were on Davis's upper right holding his arm and torso, Tassone was on Davis's upper left, Hanlon was also helping to hold down Davis's upper body, and Flowers was holding one of Davis's legs. Wiegers, who at this point was standing four or five feet from Davis's legs, said that she could see one of Davis's boots but not his head.

Plesh, Tassone, and Davis testified that after the MHWs had subdued Davis on the floor, Bragg punched the patient in the head. Plesh, whose account is crucial to the jury's findings, said he was standing next to Wiegers about three feet from Davis. He recounted: "Jason is lying down the hallway, head is away from me, feet are towards me. Staff is encircling him. And it's not what I saw, it's what I felt. I initially felt the thud through the floor and then heard a thud." Plesh said he looked up and saw Bragg punch Davis in the head four to five times. Plesh continued:

-8-

I turned to Joyce Wiegers who was on my right shoulder . . . When I saw Jason Davis being punched, I said, 'Did you see that? Are you going to do anything about this? Are you going to allow this to happen?' . . . She didn't say anything, and I really wasn't waiting at that point. Some more was occurring and at that point I decided to intervene.

As the MHWs began rolling the patient onto his stomach, Bragg twisted Davis's neck to the side and Plesh climbed over the other MHWs to push Bragg away. Plesh said that the punching and neck twisting happened "very fast."

Tassone corroborated aspects of Plesh's testimony. He said that he saw Bragg punch Davis hard three times and that he heard Plesh say: "What are you doing? What are you doing? Stop it, stop it." When asked why he did not intervene to stop Bragg from punching Davis, Tassone said: "It wasn't time. It wasn't a split second between when the officer said something, I looked up, and Phillip Bragg hit him, and then it was over."[1]

Davis testified about the punching: "It was over and over and over and over again. It was like it would never stop. . . And then I was calling for help and nobody was stopping them and they kept hitting me. . . I felt the blood; it was, you know, it was

---

[1] Tassone also testified that he later tried to talk to another Westborough staff member about the incident off the record, and that the employee told him to report what had happened to the Disabled Persons Protection Commission. Tassone said he was afraid to make the report and left his job at Westborough a few days later.

coming down my face." Plesh said that Davis's "eyes were rolling out of his head," that "[t]here was swelling, bruising all in his face," and that he checked to make sure that Davis's neck had not been broken. Tassone said that Davis's face was cut and bloody.

Bragg denied that he punched Davis. He said that after helping bring Davis to the floor he asked Plesh to relieve him because his arm was sore from the struggle. Bragg said that Plesh asked, "Don't you think you're hurting him?" and that Bragg answered "no." Fitzpatrick, Gillis, and Hanlon all said that they were within three feet of Davis's head, did not see Bragg punch Davis, and were not aware of Plesh's intervention. Flowers, Rennie, and Wiegers also testified that they did not see any punching or violence toward Davis.

Plesh testified that when the restraint was over, Wiegers got down on her knees in front of Davis and said, "This is what you get when you act -- this is what you get when you act like this." Davis testified that Bragg said these words to him, and that Wiegers said something else. Wiegers denied making any comments to Davis.

After the MHWs finished rolling Davis over, Plesh handcuffed him for transport to the four-point room. When Davis was placed on the restraint bed and secured, Plesh took the handcuffs off at Wiegers's direction and left to find a doctor. In the hallway, he saw Dr. Kamalika Weeratne, whom Wiegers had called. Plesh then found

Bragg and arrested him for assault and battery.[2] In connection with the arrest, Plesh later returned with his supervisor to photograph Davis's injuries. These pictures were introduced at trial.

Wiegers testified that her supervisor, David Potter, told her to write a report about the restraint of Davis before she left for the day. In the report Wiegers wrote of Davis's bruises: "Unknown when or how injury sustained" and "Unknown to writer precipitants to occurrence." At trial, she said that she used those phrases because she was not sure how the restraint caused Davis's injuries and because she had not received an explanation from Chauncy Hall about why Davis was being sent to Hennessey. Wiegers also filled out an internal Westborough complaint form about Plesh's arrest of Bragg in which she wrote: "Improper and disturbing arrest by security of a staff member."[3] Fitzpatrick and Gillis also made an internal complaint a few days after the restraint alleging that after handcuffing Davis, Plesh told them to twist the handcuffs if the patient continued to struggle, and then demonstrated the twist on Davis.

---

[2] Bragg was eventually found not guilty of the charges. Tassone did not testify at his trial.

[3] Wiegers also helped bail Bragg out of jail. She and Bragg testified that they had a social relationship. Bragg said that he and his children were living in Wiegers's home at the time that the events at issue here took place. Wiegers denied that, saying that Bragg moved in with her for a short period a few weeks or months later.

Dr. Weeratne testified that when she examined Davis after the restraint, she found bruises on the left side of his face, scratches on the right side, and an enlarged left pupil. Dr. Weeratne said she sent Davis to the emergency room at the University of Massachusetts Hospital in Worcester to rule out more serious head injuries. Davis did not require further treatment at the hospital and was released that day.

Davis presented additional medical evidence at trial from Dr. R. Amos Zeidman, his treating psychiatrist for periods beginning in 1991. In late 1996 or early 1997, Dr. Zeidman diagnosed Davis with Post Traumatic Stress Disorder (PTSD) as a result of the physical restraint at Westborough. He said that Davis "was horrified" by the event because "[h]e thought he was going to die." Dr. Zeidman said that Davis's PTSD symptoms included insomnia, anxiety, panic states, flashbacks, nightmares, and an inability to concentrate. He said that Davis was having difficulty making progress in therapy because he was afraid to trust anyone and that "[t]he quality of his life has suffered terribly for this."

On August 2, 1996, Davis filed suit alleging that the May 12, 1993 physical restraints in the quiet room and hallway violated his rights under 42 U.S.C. § 1983 and the Massachusetts Civil Rights

Act, Mass. Gen. Laws ch. 12 § 11 I.[4]  Davis sued MHWs Bragg,

Fitzpatrick, Gillis, Hanlon, Rennie, Tassone, Joseph, and Flowers for

the use of excessive force during the first physical restraint in the

quiet room and the second restraint in the hallway.  He sued the same

defendants and Wiegers for failing to intervene to prevent Bragg's

use of excessive force during the second restraint and for violating

his right to freedom from unreasonable bodily restraint.[5]

In their answer to Davis's complaint, the MHWs pleaded the

defense of qualified immunity.[6]  On the ground that the factual

disputes in the case precluded a qualified immunity determination

before trial, the district court deferred the issue.  Trial began on

September 29, 1998.  At the close of evidence, the court told the

jury without objection that only Bragg, Rennie, and Hanlon were

accused of violating Davis's rights during the first physical

restraint in the quiet room, and that all the MHWs and Wiegers were

---

[4] Davis also brought claims pursuant to 42 U.S.C. § 1985 (conspiracy to interfere with civil rights), which the trial judge dismissed at the close of evidence, and for false imprisonment, which the jury rejected.  Neither side challenges these dispositions on appeal.

[5] Davis also sued two former commissioners of the Massachusetts Department of Mental Health and a former chief operating officer of Westborough.  Davis alleged that the department's policies violated his civil rights because they allowed Bragg to be hired as a convicted felon.  The jury rejected these claims, and this aspect of the verdict is not challenged on appeal.

[6] Wiegers did not offer this defense in her answer or in her motion for judgment as a matter of law under Fed. R. Civ. P. 50(a).

accused of violating Davis's rights during the second physical restraint in the hallway.

On October 28, 1998, the jury returned a verdict against Bragg, Fitzpatrick, Gillis, Hanlon, Rennie, Tassone, and Wiegers. A separate verdict slip for each defendant asked whether the jury found that the defendant had violated Davis's constitutional and Massachusetts civil rights.[7] A single verdict slip on damages asked the jury to set one amount for compensatory damages and to set amounts for punitive damages for each defendant against whom it chose to award them. The jury awarded Davis $100,000 in compensatory damages, and punitive damages of $500,000 each against Bragg and Wiegers; $250,000 against Rennie; and $100,000 each against Fitzpatrick, Gillis, and Hanlon. No punitive damages were assessed against Tassone. On January 13, 1999, the court denied the defendants' claims of qualified immunity in a memorandum. With the exception of Bragg, who does not appeal the judgment against him, the defendants filed a motion for remittitur, which the judge granted by reducing by half the punitive damages awards against each of them. Davis accepted the remittitur. This appeal followed.[8]

---

[7] A sample verdict slip for liability and the verdict slip for damages are attached as appendices to this opinion.

[8] In advance of full appellate briefing, Davis filed two motions to dismiss the appeal as untimely filed and to restrict the issues that the appellants may raise on appeal. He incorporates these motions into his appellate brief. Davis's arguments are without merit, and we

- 14 -

A. The Failure to Intervene Claim

We begin with the appellants' arguments of error relating to the claim that they failed to intervene to prevent Bragg from punching Davis. The appellants challenge the judge's instructions on this claim. They also argue that there was insufficient evidence to support a finding that they failed to intervene.

1. The Jury Instructions

a. Substantive Due Process

The appellants contend that the judge should have instructed the jury that it could impose liability only if it found that the failure to intervene "shocks the conscience." As a fallback position, the appellants argue that, at a minimum, the instructions should have premised liability on a finding that the appellants were deliberately indifferent. Finally, they argue that the judge erred by failing to charge an "objectively reasonable" standard for the failure to intervene claim, as he said he would at the pre-charge conference.

The judge began his charge to the jury with Davis's claims against Bragg. In connection with the claim that Bragg violated Davis's constitutional rights by using excessive force, the judge gave an "objectively reasonable" instruction, telling the jury to determine

reject them.

"whether a reasonable mental health worker in Bragg's position would or would not have acted as he did." Turning to the claims against the appellants, the judge said: "To the extent that the claims against them are the same as the claims against Mr. Bragg, you follow the instructions I have just given about the claims against Mr. Bragg. However, as you recall, there are charges made against the [other] defendants beyond those made against Mr. Bragg." The judge then said that Davis claimed the appellants deprived him of his constitutional rights "by failing to intervene to protect him from Mr. Bragg's alleged assault." The judge continued:

> To prevail on this claim, Mr. Davis must establish by a preponderance of the evidence as to each defendant separately:
> 1) That that defendant was present at the scene of the alleged excessive use of force by Mr. Bragg at the time it occurred;
> 2) That that defendant actually observed the alleged excessive use of force by Mr. Bragg;
> 3) That that defendant was in a position where he or she could realistically prevent the alleged use of excessive force by Phillip Bragg; and
> 4) That there was sufficient time available to that defendant to prevent the alleged excessive use of force. In sum . . . you must determine as to each defendant whether he or she actually knew of Mr. Bragg's alleged punching, whether he or she could have prevented it, whether there was enough time to do so, and whether he or she failed to do so.

In assessing these instructions, we begin with the basis of Davis's claims. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights

elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (internal quotation marks omitted). We must thus identify the specific right alleged to have been violated. See Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). Here, Davis's rights stem from the Fourteenth Amendment's protection against state action depriving an individual of life or liberty without "due process of law." U.S. Const. art. XIV. "The most familiar dimension of due process is protection of procedural rights, but the due process concept has been extended by the Supreme Court to incorporate substantive protections." Hasenfus v. LaJeunesse, 175 F.3d 68, 70-71 (1st Cir. 1999) (citing Washington v. Glucksberg, 521 U.S. 702, 719-20 (1997)).

The strand of substantive due process jurisprudence primarily at issue here involves Davis's right to be free from the use of excessive force and the appellants' failure to prevent that force. The state has a duty to protect incarcerated prisoners and involuntarily committed mental patients from harm by a state actor. DeShaney v. Winnebago County, 489 U.S. 189, 199 (1989); Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982). For involuntarily committed patients, "a set of unique rules has developed" according to which "failures to act . . . may comprise a due process or other constitutional violation because the state-imposed circumstance of

- 17 -

confinement prevents such individuals from helping themselves."[9]

Hasenfus, 175 F.3d at 71; see also Shaw v. Strackhouse, 920 F.2d 1135, 1144 (3d Cir. 1990) ("Once the state restrains an individual's liberty, rendering that individual unable to act for himself . . . the state does acquire an affirmative duty to protect.").

For similar reasons, we have said that the state also has a duty in some circumstances to intervene to protect arrestees and pretrial detainees.  We initially discussed such a duty in Gaudreault v. Salem, 923 F.2d 203 (1st Cir. 1990) (per curiam), cert. denied, 500 U.S. 956 (1991), saying: "An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance."  Id. at 207 n.3.  Although this statement is dicta,[10] Gaudreault cited two cases in which other circuits have held squarely that police officers have a duty to intervene when they see another officer use excessive force against a pretrial detainee.  See

---

[9] A convicted prisoner may bring a claim for use of excessive force under the Eighth Amendment.  See Hudson v. McMillan, 503 U.S. 1, 4 (1992).  At least one court has found that a prison guard has a duty to protect a prisoner from the use of excessive force by another prison guard.  See McHenry v. Chadwick, 896 F.2d 184, 188 (6th Cir. 1990).

[10] Gaudreault brought suit against four officers who allegedly were present when another unidentified officer attacked him.  We noted that nonfeasance offered a "potential basis of liability." Gaudreault, 923 F.2d at 207 n.3.  Since Gaudreault's complaint said that the attack "was over in a matter of seconds," we found no liability because the officers did not have a realistic opportunity to intercede.  Id.

O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988); Byrd v. Brishke, 466 F.2d 6, 10 (7th Cir. 1972). Moreover, we cited O'Neill and Gaudreault and restated the existence of a duty to intervene on the part of police in Martinez v. Colon, 54 F.3d 980, 985 (1st Cir. 1995).[11]

Gaudreault is thus good law in our circuit, and the record reveals that it was the source of the four-point instruction that the trial court gave on the failure to intervene claim. With the legal scene thus set, we turn to the appellants' arguments about why the instructions were in error.

### b. The "Shocks the Conscience" Standard

In a motion proposing jury instructions, the appellants asked the judge to instruct the jury that it could impose liability only if it found that the appellants' failure to intervene to protect Davis involved behavior so extreme as to "shock the conscience." They preserved this argument by objecting to the charge after it was given. See Fed. R. Civ. P. 51. On appeal, they argue that the court's

---

[11] In Martinez, a police officer accidentally shot another officer during a harassment incident. We found that the victim's § 1983 claim against other officers who witnessed the incident was precluded because the assailant was engaged in a clearly personal pursuit when he shot the victim, and so was not acting under color of state law, as § 1983 requires. See Alexis v. McDonald's Rest., 67 F.3d 341, 351 (1st Cir. 1995) ("A Section 1983 claim does not lie absent state action."). Martinez is distinguishable from both Gaudreault and the case at hand because there is no dispute that the appellants, as employees at a state mental hospital, were acting under color of state law.

- 19 -

failure to give that instruction was error.

The appellants rely on Sacramento v. Lewis, 523 U.S. 833 (1998), which involved a high-speed car chase by a police officer that ended in the death of a passenger in the suspect car. Id. at 837. The Court held that the police officer who gave chase had not violated the passenger's substantive due process rights because "in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." Id. at 836. The Court likened a police officer faced with a fleeing suspect to a prison guard faced with a riot. Id. at 853. In such situations, police or guards

> have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance.

Id. (internal quotations marks omitted). The appellants argue that they similarly faced circumstances that were "tense, evolving, and requiring split-second decisions," and thus were entitled to a "shocks the conscience" instruction. At first glance, the analogy has some appeal. Davis was drunk, possibly threatening initially, and eventually violent. However, the evidence pertaining to Davis's failure to intervene claim focused on what the MHWs and Nurse Wiegers

- 20 -

did or failed to do _after_ Davis had been restrained.  The premise of the trial court's decision to give the _Gaudreault_ instruction was that a reasonable jury could have found that Davis had been subdued when Bragg began punching him repeatedly, allowing the appellants sufficient time and a realistic opportunity to concentrate on their primary responsibility of protecting the patient.  Given this plausible view of the evidence, the appellants, unlike the police officer in _Lewis_, did not face competing obligations between restoring order and exacerbating disorder once Davis had been restrained.  By requiring the jury to find that the defendants had sufficient time to prevent the alleged excessive use of force by Bragg, the _Gaudreault_ standards focused properly on the factual element that removes this case from the ambit of _Lewis_ and its "shocks the conscience" standard. The appellants' argument to the contrary fails because it collapses the short time in which the appellants had to respond to Bragg's punching of Davis into the restraint itself.

Moreover, there is precedent for subjecting the conduct of a mental health worker to a more exacting standard than that of a prison guard controlling a riot or a police officer chasing a fleeing car.  As the Supreme Court has said: "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." _Youngberg_, 457 U.S. at 321-22.

- 21 -

Davis was in the state's custody because of mental illness, not culpable conduct, and the trial court's decision to reject the "shocks the conscience" standard is consistent with this distinction. See Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir. 2001) ("The Eighth Amendment excessive-force standard provides too little protection to a person whom the state is not allowed to punish."). For all of these reasons, the trial court did not err by declining to give a "shocks the conscience" instruction.

c. The "Deliberate Indifference" Standard

With minimal argument, the appellants assert in the alternative that Lewis and our precedent in Hasenfus v. LaJeunesse at least required an instruction that premised liability on a finding that the appellants were deliberately indifferent in failing to prevent the harm to Davis. In the proceedings below, they initially asked for a "deliberate indifference" instruction (as well as for the Gaudreault instructions that the trial court gave) in "Requested Instruction Number 5" of their pre-charge motion. After the Supreme Court decided Lewis, the appellants submitted a motion for a "Supplemental Jury Instruction" subcaptioned "Revising Defendant's [sic] Previous Request No. 5". This motion requested a "shocks the conscience" instruction based on Lewis. At the pre-charge conference, the court said that it would instruct the jury on the "objectively reasonable" standard. Appellants' counsel responded: "And not

deliberate indifference and not -- well, then, let my objection be noted for the record." However, after the court gave its Gaudreault instruction, the appellants ignored the omission of a "deliberate indifference" instruction and objected only on the ground that it did not include the "shocks the conscience" standard.

Federal Rule of Civil Procedure 51 states: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed R. Civ. P. 51. We interpret this rule strictly. When counsel fails to raise an objection again following the actual charge, "[a]ccording to a long line of precedents in this circuit, such an omission constitutes waiver of the objection pursuant to Federal Rule of Civil Procedure 51." Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 809 (1st Cir.) (collecting cases), cert. denied, 488 U.S. 955 (1988). Our explanation in Wells Real Estate of the plaintiff's waiver of an interstate commerce instruction applies equally to the appellants' waiver of a "deliberate indifference" instruction here, which occurred in light of a post-charge conference recorded in twelve pages of trial transcript:

> In this case, the court gave counsel abundant opportunity to object to the charge after it was given. An extensive post-charge conference was held with all counsel present. . . . Plaintiff's

- 23 -

> attorney did reiterate several of his prior requests and exceptions, but with no mention of interstate commerce. Given this ample opportunity at the post-charge conference, appellant cannot now be said to have avoided waiver of its exception to the interstate commerce charge.

Id. (internal quotation marks omitted).

We permit a plain error exception to failures to adhere to Rule 51. However,

> [t]he plain error standard, high in any event . . . is near its zenith in the Rule 51 milieu. At least five times over the years we have quoted the following maxim with manifest approval: If there is to be a plain error exception to Rule 51 at all, it should be confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings.

Toscano v. Chandris, S.A., 934 F.2d 383, 385 (1st Cir. 1991) (citations and internal quotation marks omitted). In Wells Real Estate, we noted that "to our knowledge," we had never reversed a civil case on the basis of plain error under Rule 51. 850 F.2d at 809. As far as we can determine, that is still true, and this case does not change that record.

In Hasenfus, we analyzed allegations about a public school's failure to take steps to prevent a student's attempted suicide in terms of whether the school's inaction either shocked the conscience or was deliberately indifferent. 175 F.3d at 72. We discussed in passing the rights of involuntarily committed mental

patients and prisoners when their caretakers fail to act, stating descriptively that liability "arises under section 1983 if the plaintiff shows that the inaction was malicious or reflected the official's 'deliberate indifference,' to the welfare of the prisoner or inmate." Id. at 71 (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

Because the facts of Davis's case differ in important ways from the scenario discussed in Hasenfus, the dicta in that case about the "deliberate indifference" standard did not require the trial court to apply that standard here. While a reasonable jury could have found that the appellants had sufficient time to react to Bragg's use of excessive force, the circumstances of the hallway restraint did not allow them to think about what to do before Bragg's blows began. The Supreme Court emphasized in Lewis that "[a]s the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." Id. at 851. The circumstances of this case make the "deliberate indifference" standard an awkward fit. Accordingly, we find that the omission of that instruction was not plain error.

d. The "Objectively Reasonable" Standard

At the pre-charge conference, the judge said that he intended to charge an "objectively reasonable" standard for the excessive force claim against Bragg and for the failure to intervene

claims against the appellants.  At trial, he gave the "objectively reasonable" instruction in setting forth the standard of liability for the claims against Bragg, but he did not repeat that standard in connection with the Gaudreault elements in the charge concerning the claim against the appellants.

The appellants argue, therefore, that the judge "essentially instructed the jury to ignore the 'objectively reasonable' standard and in its place . . . substituted a four point checklist."  Since the judge told the jury to follow the instructions given for the claims against Bragg to the claims against the appellants only to the extent that the claims were the same, we agree that the jury would not have understood that they were to apply the explicit "objectively reasonable" standard given for the excessive force claim against Bragg to the failure to intervene claim against the appellants.  However, the appellants did not object after the charge to the judge's lack of repetition of the "objectively reasonable" language.  We thus again review the instruction for plain error, reversing only in "the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings."  Toscano, 934 F.2d at 385 (citation and internal quotation marks omitted).

The "objectively reasonable" standard comes from cases concerning the use of excessive force during an arrest or traffic stop

under the Fourth Amendment's protection against unreasonable search and seizure.  See Graham, 490 U.S. at 388.  The Eighth Circuit has used the "objectively reasonable" standard for excessive force claims brought by a pretrial detainee and an involuntarily committed mental patient.  See Johnson-El v. Schoemehl, 878 F.2d 1043, 1048-49 (8th Cir.) cert. denied, 493 U.S. 824, 871 (1989) (applying objectively reasonable standard to pretrial detainee's excessive force claim); Andrews, 253 F.3d at 1061 (applying standard to involuntarily committed patient's excessive force claim).[12]

An early failure to intervene case, Byrd v. Brishke, 466 F.2d 6, said that a state actor who is under an affirmative duty to act "is responsible if his omission is unreasonable in light of the circumstances."  Id. at 10.  O'Neill and Gaudreault, however, did not use the "objectively reasonable" language for the failure to intervene claims.  See O'Neill, 839 F.2d at 11-12; Gaudreault, 923 F.2d at 207 n.3.  Instead, they refined the Byrd standard for a failure to intervene case by dividing it into four specific elements.  The first two elements of the Gaudreault standard are actor-specific, focusing on whether the defendant was present at the scene and saw the use of

---

[12] The Seventh Circuit has used the "objectively reasonable" standard for a schoolchild's excessive force claim.  See Wallace v. Batavia Sch. Dist. 101, 68 F.3d 1010, 1015 (7th Cir. 1995).  Other circuits have rejected the "objectively reasonable" standard for excessive force claims brought by pretrial detainees.  See Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000); Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998) (collecting cases).

force.  The third and fourth elements ask the jury whether the defendant could realistically have prevented the alleged use of excessive force and whether there was sufficient time to do so.  The operative words of these elements, "realistically" and "sufficient," focus the jury's attention on the attendant circumstances, and whether those circumstances, under any reasonable view, permitted intervention.  Given these objective components of the Gaudreault instruction, the omission of the "objectively reasonable" language, if error at all, was assuredly not plain error.

### 2. Sufficiency of the Evidence

The appellants argue that there was insufficient evidence for a reasonable jury to have found that Davis's constitutional rights were violated by their failure to intervene to prevent Bragg from using excessive force.  As we have said, the trial judge instructed the jury under Gaudreault that each defendant could only be found liable if he or she was present when excessive force was used; observed the use of excessive force; was in a position where he or she could realistically prevent that force; and had sufficient time to do so.  We must affirm the jury's findings on questions of fact "unless the record is devoid of evidence upon which the jury might reasonably base its conclusion."  Coastal Fuels v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996) (internal quotation marks omitted).

### a. Evidence that the Appellants Saw Bragg Punch

Davis

With the exception of Tassone, the appellants begin by arguing that there was no evidence that any of them observed Bragg use excessive force during the hallway restraint.  However, there was testimony that Fitzpatrick, Gillis, and Hanlon were each within three feet of Davis's head, holding on to part of his upper body or arm, when the punching and neck twisting occurred.  Plesh testified that he felt and heard the thudding of the punches through the floor, and then looked up and saw what Bragg was doing.  Tassone testified that he heard Plesh call out and, in response, he looked up and saw Bragg punch Davis.  The jury could have reasonably inferred from Plesh and Tassone's testimony and the proximity of Fitzpatrick, Gillis, and Hanlon to Davis's head that the three of them must have observed Bragg's actions.

Moreover, the jury's finding of no liability for Jeffrey Flowers suggests that it carefully weighed the evidence about the position and degree of awareness of each MHW.[13]  When asked at trial whether he saw Bragg punch Davis, Flowers answered: "My head was tucked down when I was on this guy's leg, and I saw nothing. . . I can tell you exactly why I didn't look at the head . . . Because this was a big, strong man, and when I had him by the leg -- this guy was built

_____

[13] The jury also found no liability for Frantz Joseph, who was not present at the second restraint.

like a body-builder.  I'm not that big of a man."  None of the other MHWs explained why their position on Davis's body and their struggle to subdue him would have distracted them from seeing what Bragg was doing.  Moreover, they were closer to Davis's head than Flowers was.

Plesh also testified that Wiegers was standing next to him a few feet from Davis's legs, and that he turned to her and asked "Did you see that?" when the punches began.  Wiegers herself said that she was "in the vicinity" of the restraint, four or five feet away.  Based on her testimony and Plesh's, the jury could have reasonably inferred that Wiegers also saw what was happening.

The facts vary with regard to Rennie.  Several witnesses, including Davis, testified that Davis kicked Rennie hard in the stomach as the two came out of the quiet room, in the moment before the hallway restraint.  Rennie said of his reaction to the kick: "All I remember really -- I just remember being kicked very hard in the hallway, and I felt like I was out for the count. . . . I stayed there on the floor for -- I don't know.  It seemed like a long time."  When asked if he saw "a group of people" during the hallway restraint, Rennie said: "I don't think I did, no. . . . I don't recall."  Based on this account, Rennie argues on appeal that he was incapacitated by the kick and so cannot be held liable for failing to prevent Bragg's use of excessive force during the hallway restraint.

Tassone and Davis, however, testified that Rennie was

present when Bragg punched Davis. When Davis's counsel asked Tassone on direct examination if Rennie was holding Davis's right arm during the hallway restraint, Tassone answered "yes." Later on direct examination, Tassone expressed some uncertainty on this point, concluding: "I thought Paul [Rennie] came back to continue holding on the arm, but I can't say for sure." Davis testified that Rennie made aggressive comments to him in the quiet room and initiated the first restraint. He said that when he was hit by someone as he was brought to the floor a second time in the hallway: "I assumed it was Paul."

The evidence that Rennie participated in the hallway restraint, and so could have seen Bragg punch Davis, is thinner than the evidence relating to the other appellants. However, based on Tassone's and Davis's testimony, a reasonable jury could have found that Rennie participated in the hallway restraint and so must have seen Bragg's use of excessive force. While Tassone said that he could not be sure that Rennie was holding Davis's arm, he did not retract his testimony. Davis also said that he thought Rennie was involved. The jury was thus faced with competing accounts of Rennie's participation, and we cannot say that its choice to credit Tassone's and Davis's accounts over Rennie's self-serving account was unreasonable.

b. Evidence that the Appellants Had a Realistic

Opportunity and Sufficient Time to Intervene

The appellants next argue that there was not enough evidence to support a finding that they had a realistic opportunity and sufficient time to intervene because only seconds elapsed during the punching, and not even Plesh was able to intervene in time to stop it. The appellants are correct that courts have shown special concern about imposing liability on state actors "forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 397; see also Andrews, 253 F.3d at 1062 n.8 (distinguishing a case in which security staff must "act quickly and effectively" to protect involuntarily committed mental patients from those in which patients may be protected "through before-the-fact measures"); O'Neill, 839 F.2d at 11-12 (three blows struck in rapid succession by one police officer not of sufficient duration to impose duty to intervene on another officer who stood by).

Here, however, the jury reasonably could have found that the MHW appellants had the time and the opportunity to intervene. The MHWs were all on the floor within about three feet of Davis's head. Plesh, by contrast, was standing the length of Davis's body and three feet away. The jury could have inferred that if Plesh had time and opportunity to ask Wiegers about stopping the beating and then to respond as an "extra" man at the scene when she failed to act, the

MHWs -- whose job it was to execute the restraint -- had time and opportunity to take effective action. The fact that Plesh did not move in time to stop the punching is irrelevant to whether the MHWs, who were closer to Davis's head, could have intervened to prevent some of the beating and neck twisting.

Wiegers was farther from Davis and Bragg than the MHWs were. As a nurse who was directing rather than carrying out the restraint, she did not have the same duty to physically intervene that the MHWs had. However, Wiegers could have intervened simply by calling to Bragg to stop. In Durham v. Nu'Man, 97 F.3d 862 (6th Cir. 1996), the Sixth Circuit found that a nurse who stood by while hospital security officers beat an involuntarily committed mental patient could be found liable because she failed to direct the officers to stop their attack. Id. at 868. The court pointed out that "[c]oming to [the patient's] aid would not have required [the nurse] to become physically involved in the incident." Id. The same is true here.

Wiegers attempts to distinguish Durham by stressing that the beating in that case lasted ten minutes, whereas she had far less time to intervene. However, since Plesh was able to climb over the MHWs and push Bragg away during the time span from the punching to the neck twisting, the jury could have found that there was enough time for Wiegers to call out and order Bragg to stop and so avoid some of

the beating.  In sum, there was sufficient evidence to support the jury's finding that the appellants failed to intervene to protect Davis.

B.  <u>The Unreasonable Bodily Restraint Claim</u>

        1. The General Verdict

        The appellants also argue that the judge erred in instructing the jury on the claim that the appellants violated Davis's right to freedom from unreasonable bodily restraint, and that there was insufficient evidence to support a finding of liability based on this claim.  Before turning to these arguments, there is a threshold issue that we must address.  The liability verdict slips used in this case asked only one question of the jury about liability pursuant to 42 U.S.C. § 1983: "Do you find that Jason Davis has proved by a preponderance of the evidence that [each defendant] deprived Jason Davis of his constitutional rights on August 12, 1993?"  The verdict slips thus do not tell us whether the jury found the appellants liable, and awarded damages, for their failure to intervene to protect Davis from Bragg's use of excessive force, or for their violation of Davis's right to freedom from unreasonable bodily restraint, or for both.

        Without arguing the point directly, the appellants assume that they are entitled to a new trial if we find reversible error on either theory submitted to the jury.  The source of this arguable

right is <u>Sunkist Growers</u> v. <u>Winckler & Smith Citrus Prods. Co.</u>, 370 U.S. 19, 29-30 (1962) and <u>United New York & New Jersey Sandy Hook Pilots Ass'n</u> v. <u>Halecki</u>, 358 U.S. 613, 619 (1959).  In these cases, the Supreme Court reversed and remanded for a new trial when one of multiple claims submitted to the jury was tainted by legal error, saying that the generality of the verdict "prevents us from perceiving upon which plea [the jury] found.  If, therefore, upon any one issue error was committed, either in the admission of evidence, or in the charge of the court, the verdict cannot be upheld."  <u>Sunkist</u>, 370 U.S. 19, 30 (quoting <u>Maryland</u> v. <u>Baldwin</u>, 112 U.S. 490, 493 (1884)).

Citing <u>Sunkist</u> and <u>Sandy Hook</u>, some courts have automatically reversed and remanded for a new trial when there is <u>any</u> error in one of multiple claims on which the general verdict may rest. See Elizabeth Cain Moore, <u>General Verdicts in Multi-Claim Litigation</u>, 21 Mem. St. U. L. Rev. 705, 711-12 & n.41 (1991) (collecting cases). However, other courts have analyzed whether it was harmless error to submit to the jury a theory encompassed in a general verdict form when that theory was tainted by legal error.[14]  In <u>Sunkist</u> and <u>Sandy Hook</u>

_____

[14] <u>See, e.g.</u>, <u>Braun</u> v. <u>Flynt</u>, 726 F.2d 245, 251 (5th Cir. 1984) (remanding for new trial because of "substantial likelihood" that damages award was based at least in part on erroneous claim); <u>Morrissey</u> v. <u>Nat'l Maritime Union of Am.</u>, 544 F.2d 19, 27 (2d Cir. 1976) ("no sufficient basis for confidence" that verdict would not have been rendered without the erroneous claim); <u>Collum</u> v. <u>Butler</u>, 421 F.2d 1257, 1260 (7th Cir. 1970) ("the results of the present trial would not have been substantially affected if these [erroneous] issues had not been submitted to the jury"); <u>see</u> <u>also</u> <u>Traver</u> v. <u>Meshriy</u>, 627 F.2d 934, 938

Pilots, the Supreme Court explained its rationale for reversing when one of multiple claims submitted was erroneous, saying "there is no way to know that the invalid claim . . . was not the sole basis for the verdict." Sandy Hook Pilots, 358 U.S. at 619.  The harmless error approach addresses this concern by requiring reversal unless the reviewing court concludes that it is "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." E.I. Du Pont De Nemours & Co. v. Berkeley & Co., 620 F.2d 1247, 1258 n.8 (8th Cir. 1980).  As the Tenth Circuit has said, Sunkist "does not paint with as broad a brush as appears from the language quoted.  As with all errors committed at trial, a litmus test for reversal is whether the appellant was thereby unjustly prejudiced." Asbill v. Housing Auth. of Choctaw Nation, 726 F.2d 1499, 1504 (10th Cir. 1984).

We have implied approval of this harmless error approach in other cases, analyzing whether an error in one of multiple claims submitted to the jury was harmless.  See Fleet Nat'l Bank v. Anchor Media Tel., Inc., 45 F.3d 546, 555 (1st Cir. 1995) (while the invalid claim "was not the primary focus of [appellee's] case," counsel mentioned it in opening and closing arguments and called a witness

_____

(9th Cir. 1980) (when one of multiple theories of liability is unsound, a "reviewing court has discretion to construe a general verdict as attributable to another theory if it was supported by substantial evidence and was submitted to the jury free from error"); Adkins v. Ford Motor Co., 446 F.2d 1105, 1108 (6th Cir. 1971) (same).

specifically to testify to this aspect of the case); <u>Kassel</u> v. <u>Gannett Co.</u>, 875 F.2d 935, 950 (1st Cir. 1989) ("In this instance, we cannot say the error was harmless.  A substantial amount of plaintiff's proof addressed the [erroneous claim]"); <u>Brochu</u> v. <u>Ortho Pharm. Corp.</u>, 642 F.2d 652, 662 (1st Cir. 1981) (holding that "defendant was not harmed" by submission of invalid fraud claim).  We follow the harmless error approach here in our analysis of the unreasonably bodily restraint claim.  First, we address the appellants' arguments that there was error in the jury instructions on the unreasonable restraint claim and insufficient evidence to support a finding that each of the appellants was liable for unreasonably restraining Davis.  Concluding that there was no error in the jury instruction, but that the evidence was insufficient to support an unreasonable restraint finding for any of the appellants save Rennie, we ask whether we can be reasonably certain that the jury's verdict did not rest on this erroneous basis.

We make one additional point before beginning this analysis, prompted by the absence of any objection by the appellants to the general verdict form or a request for interrogatories to separately ask the jury about the failure to intervene and unreasonable restraint claims.  The Eighth Circuit has adopted the following waiver rule: if the complaining party does not object to a general verdict form or request interrogatories, a verdict that encompasses multiple claims of liability may be affirmed as long as

- 37 -

there is substantial evidence to support one of the theories presented, irrespective of any reversible errors in other claims submitted to the jury.  See Gen. Ind. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 801 (8th Cir. 1987) (because appellant did not challenge the general verdict form's wording at trial or on appeal, "it is sufficient for purposes of upholding the jury's damage award that . . . we affirm the jury's verdict that Hartz violated § 2 of the Sherman Act."); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1054 (8th Cir. 2000) (distinguishing instant case from Hartz on the ground that the appellant specifically objected to the general verdict form at trial).  The Seventh and Tenth Circuits have applied the same rule in some cases.  See Eastern Trading Co. v. Refco, Inc., 229 F.3d 617, 622 (7th Cir. 2000) (where jury heard instruction on theory for which there was no evidentiary support and opposing party did not request interrogatory, party "has only itself to blame for its inability to demonstrate that the jury was confused by the instruction"); Kossman v. Northeast Ill. Reg. Commuter R.R. Corp., 211 F.3d 1031, 1037 (7th Cir. 2000) ("Because the defendant never requested any special form of verdict, the jury only returned a general verdict for Kossman.  And when a jury only returns a general verdict, we need only find support in the record for one of the theories presented to the jury in order to affirm the jury award."); Union Pac. R.R. Co. v. Lumbert, 401 F.2d 699, 701 (10th Cir. 1968)

("In the absence of a pertinent objection to the charge or a request for a specific interrogatory a general verdict is upheld where there is substantial evidence supporting any ground of recovery in favor of an appellee.) (internal quotation marks omitted); see also Anixter v. Home-State Prod. Co., 77 F.3d 1215, 1231 (10th Cir. 1996) (stating without applying Lumbert rule).

By contrast, we have on at least one occasion applied the multiple-claims reversal rule attributed to Sunkist without requiring an objection to the general verdict form. See Lattimore v. Polaroid Corp., 99 F.3d 456, 468 (1996) (reversing because one of four claims presented to the jury was time-barred and two others were supported by insufficient evidence). However, in Kassel and in Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122 (1st Cir. 1997), we noted in reversing that the appellant at trial either requested a special verdict form or objected when multiple claims were submitted to the jury, which returned only a general verdict. 875 F.2d at 950 and 127 F.3d at 134; see also Lattimore, 99 F.3d at 469 (Selya, J., concurring) (emphasizing "for the benefit of the trial bench and bar in days to come" that a request for a separate verdict on each claim submitted would have averted the need for a new trial). Although we do not adopt or apply a waiver rule in this case, opting instead for the continued application of the harmless error approach, we emphasize that Lattimore neither discusses nor rules on the possibility of

waiver based on failure to object to the general form of the verdict, and so does not preclude a future panel of this court from establishing such a waiver rule if persuaded by its merits.

2. The Jury Instructions

In his complaint, Davis charged that the appellants could be found liable for violating his right to freedom from unreasonable bodily restraint based on any of their actions in connection with the two restraints. In response, the appellants argued that they could not be held liable simply for carrying out the restraints, and that the judge should charge the jury that it could not find them liable for using excessive force to restrain Davis unless their conduct "shocks the conscience." The judge agreed with the first point but not with the second, instructing the jury as follows:

> Mr. Davis charges that the two so-called "take-downs" of him on August 12, 1993 VIOLATED HIS CONSTITUTIONAL RIGHT TO BE FREE FROM UNREASONABLE BODILY RESTRAINT. In determining whether there was any such unreasonable restraint, you should consider all the circumstances existing at the time and decide as to each defendant separately whether in light of those circumstances it was appropriate for that defendant to use the force that was used.

After a post-charge conference, in which both sides sought clarification of this charge and the appellants objected to the lack of a "shocks the conscience" instruction, the judge told the jury:

> The Group Two Defendants [i.e., the appellants] are accused of having used excessive force in

- 40 -

connection with the two take-downs. I want you to understand that they cannot be – none of them can be held liable simply for taking Mr. Davis into . . . the quiet room, or simply for . . . putting him into a four-point restraint alone. They can be – in order to find them liable in connection with the put-downs or the four-point restraint, you must find that excessive force was used.

The appellants renew their argument that the judge erred by omitting a "shocks the conscience" instruction. This argument has slightly more force here than in the context of the failure to intervene claim. When Davis kicked in the air in the quiet room or kicked Rennie as he entered the hallway, the appellants were faced with a physical outburst requiring an immediate response. However, without minimizing the difficulties posed by Davis's conduct, Davis's kicks were far removed from the high-speed chase or prison riot central to the "shocks the conscience" analysis in Lewis, both of which involve extreme conduct posing significant threat to the safety of innocent bystanders as well as to the safety of the officer or guard. Sadly, it is not unusual for a seriously ill mental patient to act out physically in the controlled and confined setting of a hospital. Davis's kicks fall within the norm of what mental health workers are expected to handle, and were less threatening than the circumstances described in Lewis. We agree, therefore, with the Eighth Circuit that the usual standard for an excessive force claim brought by an involuntarily committed mental patient is whether the

- 41 -

force used was "objectively reasonable" under all the circumstances. See Andrews, 253 F.3d at 1061. The circumstances of the hallway and quiet room restraints do not persuade us to impose a higher standard.

Alternately, the appellants attack the trial court's use of the word "appropriate" in its instructions, saying that it allowed the jury to find liability if the force used was "subjectively inappropriate." We do not agree that the word "appropriate" connotes subjectivity. Instead, we think that "appropriate under all the circumstances" approximates "objectively reasonable under all the circumstances." When an appellant asks us to "scrutinize a trial judge's choice of words, the central inquiry reduces to whether, taking the charge as a whole, the instructions adequately illuminate the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury." Elliott v. S.D. Warren Co., 134 F.3d 1, 6 (1st Cir. 1998) (internal quotation marks omitted). Although we think the more familiar "objectively reasonable under the circumstances" would have been the better word choice, the judge's instruction passes that test. See Interstate Litho Corp. v. Brown, 255 F.3d 19, 29 (1st Cir. 2001) ("[T]he wording of instructions is within the trial judge's discretion."). Accordingly, we find no error in the judge's instructions on the unreasonable bodily restraint claim.

3. Sufficiency of the Evidence

a. Fitzpatrick, Gillis, Hanlon, Tassone, and Wiegers

Here, with the exception of Rennie, the appellants'[15] attack on the jury findings hits the mark. Our close review of the record reveals no significantly probative evidence that any of them used excessive force to unreasonably restrain Davis. Fitzpatrick, Gillis, Hanlon, Tassone and Wiegers were not present during the first restraint in the quiet room. Hanlon was present, but Davis did not testify that he participated in the restraint performed by Rennie. During the second restraint in the hallway, Fitpatrick, Gillis, Hanlon, and Tassone held Davis down while Bragg punched him, but did not participate in the blows. Wiegers was standing a few feet away. Davis did not testify that any of these appellants themselves used force on him. Officer Plesh testified that until Bragg began to punch Davis, the MHWs' actions in performing the second restraint were appropriate and professional. Accordingly, there is insufficient evidence to support a finding that the appellants used excessive force to unreasonably restrain Davis.

As a result, we must address whether the submission of the claim of unreasonable restraint through the use of excessive force to the jury for these appellants was harmless error under the standards

_____

[15] In this section, "appellants" does not include Rennie.

we set in <u>Fleet</u> and <u>Kassel</u>.[16] Davis's case against the appellants focused on their failure to intervene to prevent Bragg's use of excessive force rather than on their own use of excessive force. Indeed, no witness, not even Davis, testified that the appellants used excessive force to unreasonably restrain the patient. Moreover, when Davis's counsel used the words "they beat him" in closing argument to describe the appellants' conduct, their counsel objected, prompting Davis's counsel to make the argument that was suggested by the evidence: "Ladies and gentlemen, when seven or eight people pin one guy to the ground and the other guy beats the person, then they're all part of it because they all had an opportunity to intercede . . . They saw that beating going down . . . Pinning him down so Phillip Bragg could do it. Everybody looked the other way."[17]

---

[16] In doing so, we clarify one point. If there was evidence that the appellants had planned with Bragg to hold Davis down so that Bragg could beat him, Bragg's use of excessive force would obviously be attributable to the appellants. Although Davis may have contemplated such a theory, that theory of the case did not go to the jury. At the close of evidence, the judge dismissed Davis's claim that the defendants conspired to interfere with his civil rights in violation of 42 U.S.C. § 1985. The judge said: "As I see the facts, there's no evidence whatsoever of an express agreement . . . and I see no basis for implying an agreement on the part of what I call the fellow worker defendants." The judge also dismissed the § 1985 claim on legal grounds, citing <u>Aulson</u> v. <u>Blanchard</u>, 83 F.3d 1 (1st Cir. 1996).

[17] The judge overruled the appellants' objection. The colloquy was as follows:

> APPELLANTS' COUNSEL: Your Honor, I have to object to 'they beat him.' I mean, that's just way beyond the scope of any evidence here, your

It is not surprising that Davis presented no proof that these five appellants used excessive force, because that was not his theory of the unreasonable restraint claim.  At the post-charge conference, Davis's counsel said to the judge: "Your Honor, I just think, to clarify, if I could . . . in terms of the placement in the four-point restraint, . . . I don't believe that you would have to show that there was excessive force relative to that placement."  The judge disagreed with Davis on this point when he charged the jury that it could only find the appellants liable for unreasonably restraining Davis through their own use of excessive force.

By contrast, as we have explained, there <u>was</u> substantial evidence that the appellants failed to intervene when the punching occurred.  Thus the jury heard two legally adequate instructions relating to the claims against the appellants, one of which was supported by the evidence and one of which was not.  In such a circumstance, "[i]t cannot just be <u>assumed</u> that the jury <u>must</u> have been confused and therefore that the verdict is tainted, unreliable." <u>Eastern Trading Co.</u> v. <u>Refco, Inc.</u>, 229 F.3d 617, 622 (7th Cir. 2000); <u>see</u> <u>also</u> <u>Burhmaster</u> v. <u>Overnite Transp. Co.</u>, 61 F.3d 461, 463-64 (6th Cir. 1995) (when a jury instruction accurately states the law but is

Honor.  This is really way crossing the line.

THE COURT: It is [a] question for the jury to decide.  But they may feel there's exaggeration here; and if that's disturbance, I don't know.

- 45 -

not supported by the facts, "[t]he jury will conclude for itself that there is insufficient evidence to support an application of the instruction, and thus reject it as mere surplusage.") (internal quotation marks omitted).

Here, a clarifying instruction that the judge gave the jury during mid-deliberation further assuages any concern that the jury may have found the appellants liable for an unreasonable restraint theory unsupported by the evidence. In response to the jury's request for clarification on the first verdict question, which asked whether each appellant deprived Davis of his constitutional rights, the judge responded by repeating only the failure to intervene instructions, saying:

> The first charge with regard to The Group Two Defendants [i.e., the appellants] is what I described as failing to intervene to protect him, that is, Mr. Davis, from Mr. Bragg's assault. . . . So, the way for you to proceed is to answer – is to look at this sheet and see whether you find that any defendant, for example, is liable for failing to intervene.

Given the lack of proof or argument at trial relating to the claim that the appellants unreasonably restrained Davis by using excessive force, and the judge's clarifying instruction, we may be "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." E.I. Du Pont, 620 F.2d at 1258 n.8. Accordingly, we find that the erroneous submission to the jury of the claim of unreasonable restraint through the use of excessive

force was harmless.

b. Rennie

In contrast to the case against the other appellants, Davis presented substantial evidence that Rennie used excessive force during the physical restraint in the quiet room.  As we have said, Davis testified that he started doing karate kicks into the air in response to Rennie's and Bragg's taunts, and that Rennie then choked him and threw him to the mat.  Davis said: "That was an assault . . . What Paul Rennie had done, grabbing someone by the neck and throwing them down is not a restraint."  Plesh corroborated much of Davis's account of the events leading up to the restraint, though he did not witness the take-down itself.

Although the prison setting obviously differs from the mental hospital setting, the factors identified by the Supreme Court in Hudson v. McMillian, 503 U.S. 1 (1992), a case involving an Eighth Amendment excessive force claim brought by a prisoner, are useful in evaluating whether this evidence was sufficient to support a jury finding that Rennie used excessive force to unreasonably restrain Davis.  The Court said that it may "be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."  Id. at 7 (internal quotation marks omitted).

We applied a similar test to a Fourth Amendment excessive force claim brought by an arrestee. See United States v. McQueeney, 674 F.2d 109, 113 (1st Cir. 1982) ("a police officer may use only such force as is reasonably necessary to effect an arrest or to defend himself or others from bodily harm").

When Rennie took Davis to the mattress, the patient was by himself in an empty room. It is difficult to see how Rennie could have reasonably perceived a threat to himself or the other MHWs standing by, all of whom could have moved out of the way or closed the door when Davis began karate kicking. Yet Rennie did not try to avert the need for force by taking such measures. Viewed in the light most favorable to the verdict, the evidence showed that Rennie provoked Davis by taunting him, and then, after the patient reacted, choked him and threw him to the mat.

Citing Dean v. City of Worcester, 924 F.2d 364 (1st Cir. 1991), Rennie argues that Davis cannot prove an unreasonable restraint claim based on the use of excessive force in the quiet room take-down because he suffered no injuries from it. In Dean, we found an arrestee's minor physical injuries insufficient to support a finding that the arresting officer used excessive force. Id. at 368 (citing Graham, 490 U.S. at 397). Our conclusion in Dean does not imply that a mental patient must sustain physical injuries to prevail on a claim that he was the victim of unreasonable restraint through the use of

excessive force. Davis's treating psychiatrist testified, and the jury must have found, that Davis suffered PTSD as a result of the restraints at issue in this case. It would be artificial, if not impossible, to attempt to separate out the psychological harm suffered as a result of one restraint as opposed to the other. The jury thus could have attributed some of Davis's mental injury to Rennie's use of excessive force to unreasonably restrain Davis during the quiet room restraint.

We recognize the difficulties faced by staff who must deal with possibly violent mental patients. In this context, as in an arrest, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . amounts to a" fourteenth amendment violation. <u>Dean</u>, 924 F.2d at 368 (citation and internal quotation marks omitted). On the other hand, the state's duty to protect those it confines because of mental illness requires that force be used as sparingly as possible. In light of the circumstances here, particularly Rennie's role in provoking Davis, we cannot say that the jury erred in finding that the level of force Rennie used was unreasonable. Accordingly, we affirm the verdict against Rennie pursuant to § 1983.

C. <u>The Massachusetts Civil Rights Act Claim</u>

The jury found that the appellants violated Davis's Massachusetts civil rights as well as his Fourteenth Amendment rights.

To prevail under the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, § 11(I), plaintiffs must prove that "(1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation, or coercion.'" Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 337 (Mass. 1996) (internal quotation marks omitted).

Since we have already affirmed the jury's findings of a constitutional violation, only the third prong of the state law test is at issue. The Massachusetts Supreme Judicial Court has defined the key terms in MCRA as follows:

> 'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. . . . 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . coercion . . . [is] 'the application to another of such force, either physical or moral as to constrain him to do against his will something he would not otherwise have done.'

Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985, 990 (Mass. 1994) (quoting Webster's New Int'l Dictionary 519 (2d ed. 1959)). The SJC has affirmed findings of MCRA violations in a variety of contexts. See Redgrave v. Boston Symphony Orchestra, 502 N.E.2d 1375 (Mass. 1987) (threats, intimidation and coercion found where third party's threat of disruption motivated defendant to cancel

performance contract); Batchelder v. Allied Stores Corp., 473 N.E.2d 1128 (Mass. 1985)(intimidation or coercion found for implied threat of arrest or removal by security guard); Bell v. Mazza, 474 N.E.2d 1111 (Mass. 1985) (threats, intimidation, or coercion found where homeowners threatened to keep plaintiffs from constructing a tennis court).

The appellants argue that there is insufficient evidence to support a finding that they intimidated or coerced Davis in connection with the failure to intervene claim because that claim involved an omission rather than an act. This characterization of the conduct of the MHW appellants is unconvincing. Fitzpatrick, Gillis, Hanlon, Rennie, and Tassone helped to restrain Davis while he was being beaten by Bragg rather than intervening to help him.[18] The SJC has said that the Act "imposes no express or implied requirement that [the] actor specifically intend to deprive a person of a secured right." Redgrave, 502 N.E.2d at 1378 (emphasis added). Instead, a defendant may be held liable for interfering with a plaintiff's rights "by threats, intimidation or coercion" if the defendant acquiesced to pressure from a third-party who intended a rights violation. Id.

_____

[18] We recognize that absent Bragg's punching, the appellants participation in the restraint would not have violated Davis's rights under MCRA. See Longval v. Comm'r of Correction, 535 N.E.2d 588, 593 (Mass. 1989) ("no coercion, within the meaning of the State Civil Rights Act, simply from the use of force by prison officials"). That, of course, is not the case before us.

(emphasis added). Here, the MHWs' acts of continuing to hold Davis down was a form of acquiescence to Bragg, who clearly intended to violate Davis's rights. Thus in MCRA's terms, the "interfer[ence] with" Davis's enjoyment of his Fourteenth Amendment rights was Bragg's beating, and the "coercion" was the appellants' physical restraint of Davis while the beating took place. Given these facts, a jury could reasonably have found that the appellants' acts constituted coercion within the meaning of MCRA. As for the unreasonable restraint claim against Rennie, the jury could have found that his use of excessive force to unreasonably restrain Davis during the take-down in the quiet room was itself intimidating and coercive.

Different facts support the jury's finding that Wiegers violated Davis's rights "by threats, intimidation, or coercion." According to Plesh, Wiegers got down next to Davis after the hallway restraint and said: "This is what you get when you act -- this is what you get when you act like this." Wiegers argues that since Plesh testified that she made this statement after the restraint concluded, it could not constitute a threat made in connection with her failure to intervene to prevent the use of excessive force. We reject this attempt to limit the relevant time frame. Because Wiegers spoke to Davis immediately after the beating, her words implied that Davis would be subject to more of the same treatment if he did not cooperate. The jury could have found that Wiegers's comment was a

threat made in connection with her failure to intervene on her patient's behalf. Accordingly, we affirm the findings of liability against the appellants under the Massachusetts Civil Rights Act.

D. Qualified Immunity

In their answers to Davis's complaint and their motions for judgment as a matter of law, the appellants, with the exception of Wiegers,[19] argued that they were entitled to qualified immunity. Following trial, the district court rejected the appellants' qualified immunity defense.

On appeal, Wiegers argues that she is entitled to qualified immunity because no court has held "that a nurse who observed the use of excessive force on an involuntary patient in the presence of a police officer had a duty to intervene." Fitzpatrick, Gillis, Hanlon, Rennie, and Tassone argue that they are shielded because no court has imposed a constitutional duty on mental health workers "to intervene to prevent a criminal assault by a co-worker upon a patient." Rennie also argues that "no objectively reasonable MHW confronted with the same circumstances as Rennie would know that the force he used to restrain Davis in the Quiet Room would somehow violate a clearly established constitutional right." The district court found that

---

[19] The district court excused Wiegers's failure to plead a qualified immunity defense "in light of the Court's repeated declarations to all counsel that qualified immunity would be addressed on Rule 50(b) motions." Without deciding the question, we assume that Wiegers may assert the defense on appeal.

because Gaudreault had been decided in 1990 and Youngberg v. Romeo had been decided in 1982, the law governing the appellants' duties to Davis was "clearly established" when the restraints took place.

A district court's denial of qualified immunity is a legal question that we review de novo.  See Iacobucci v. Boulter, 193 F.3d 14, 22 (1st Cir. 1999).  When a court grants or denies qualified immunity before trial, we "align[] the evidence most favorably to the non-movant and draw[] all reasonable inferences in his favor."  Id. When we review a post-trial qualified immunity ruling, evidence pertaining to factual findings "must be construed in the light most hospitable to the party that prevailed at trial."   Id. at 23.

Qualified immunity protects state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In discussing the "level of generality at which the relevant 'legal rule' is to be identified," the Supreme Court has said:

> [T]he right the official is alleged to have
> violated must have been 'clearly established' in
> a more particularized, and hence more relevant,
> sense: The contours of the right must be
> sufficiently clear that a reasonable official
> would understand that what he is doing violates
> the right. This is not to say that an official
> action is protected by qualified immunity unless
> the very action in question has previously been
> held unlawful . . . but it is to say that in the
> light of pre-existing law the unlawfulness must
> be  apparent.

Anderson v. Creighton, 483 U.S. 635, 639-40 (1987). Thus "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, __ U.S. __, 121 S. Ct. 2151, 2156 (2001).

There is no doubt that Gaudreault and O'Neill clearly established that a police officer has a duty to act when he sees another officer using excessive force against an arrestee or pretrial detainee if the officer could realistically prevent that force and had sufficient time to do so. See also Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir. 1982) (per curiam) ("a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly . . . Acts of omission are actionable in this context to the same extent as are acts of commission"); Putnam v. Gerloff, 639 F.2d 415 (8th Cir. 1981) (subordinate officer may be liable for failing to intervene to prevent superior officer's use of excessive force). The question is whether it would be clear to a reasonable supervising nurse or mental health worker who saw another MHW use excessive force against a patient that he or she had a legal duty to intervene.

A police officer has a duty to intervene in cases in which a fellow officer uses excessive force because his office carries with it an affirmative duty to act. See Byrd, 466 F.2d at 11 ("We believe

- 55 -

it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence."). For the same reason, at least one court has held that a prison guard must intervene when another guard uses excessive force against a prisoner. See McHenry v. Chadwick, 896 F.2d 184, 189 (6th Cir. 1990).

The cases involving police and prison guards clearly established at least the same duty for mental hospital staff at a state institution. See Durham, 97 F.3d at 868 (rejecting qualified immunity defense for hospital security officers and nurse because "the precedent holding police officers and correctional officers liable for failure to intervene was sufficient to place [them] on notice"). When an individual "is unable by reason of the deprivation of his liberty to care for himself, it is only just that the State be required to care for him." DeShaney, 489 U.S. at 199 (internal quotation marks omitted). As the Supreme Court has said: "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks omitted).

As staff members at a state mental hospital, Nurse Wiegers

and the MHWs had a duty to care for Davis, an involuntarily committed patient, comparable to that of the duty of the police officers to the pretrial detainee in Gaudreault. Bragg was Nurse Wiegers's supervisee when he assaulted Davis, and he was acting under color of state law. Nurse Wiegers's argument that she had no duty to intervene because Plesh, a security officer, was also present draws too fine a distinction between the facts here and existing case law. See Lanier, 520 U.S. at 271. As we have said, Nurse Wiegers could have tried to stop Bragg by calling out rather than physically intervening. As Bragg's supervisor, she had the responsibility to do so, and it is reasonable to expect her to have known that.

Fitzpatrick, Gillis, Hanlon, Rennie, and Tassone also reasonably may be expected to have known that the principles governing failure to intervene claims laid out in Gaudreault applied in these circumstances to them as Bragg's co-workers.[20] Indeed, a finding that any of the appellants were shielded by qualified immunity where a police officer or prison guard would not have been would place Davis

---

[20] We also reject the MHW appellants' attempt to rely on our statement in Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691 (1st Cir. 1994), that "the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases." Id. at 695. Davis's behavior in this case is easily distinguishable from that of Roy, who resisted arrest by advancing on police officers with knives while drunk. See id. at 694. The qualified immunity to which the officers in Roy were entitled because of the danger they confronted does not apply here.

at a disadvantage vis a vis pretrial detainees and prisoners in asserting his constitutional rights as a mental patient. As we have discussed, such a result is at odds with the Supreme Court's statement that involuntarily committed patients are entitled to greater protection than those "whose conditions of confinement are designed to punish." Youngberg, 457 U.S. at 321-22.

We evaluate Rennie's qualified immunity defense for his use of force in the quiet room take-down in light of Youngberg and McQueeney. Youngberg established that the right to liberty from bodily restraint "survive[s] involuntary commitment." 457 U.S. at 316. In McQueeney, we held that "a police officer may use only such force as is reasonably necessary to effect an arrest or to defend himself or others from bodily harm." 674 F.2d at 113. In light of this conclusion and Youngberg's statement that involuntarily committed mental patients merit at least the same protection as prisoners and arrestees, we reject Rennie's defense of qualified immunity.

E. Punitive Damages

As we have noted, the jury awarded punitive damages of $500,000 each against Bragg and Wiegers, $250,000 against Rennie, and $100,000 each against Fitzpatrick, Gillis, and Hanlon. With the exception of Bragg, who did not contest the damages award, the trial judge remitted these awards by half. On appeal, the appellants challenge the punitive damages awards on the ground that there is no

evidence in the record to suggest that any of the appellants "harbored any ill will towards Davis," the standard used by the court in its jury instructions.

There was sufficient evidence to support the jury's finding that the appellants acted with "evil motive" toward Davis.  Smith v. Wade, 461 U.S. 30, 56 (1983); Iacobucci, 193 F.3d at 26.  First, the jury could have found that Rennie taunted Davis in the quiet room to provoke him, and then used excessive force to unreasonably restrain Davis in the quiet room in response to the behavior he provoked.  These facts justify the jury's decision to award greater damages against him than against the other MHWs.  The jury also could have found that Fitzpatrick, Gillis, Hanlon, and Rennie held Davis to the ground knowing that Bragg was punching him, and that Wiegers stood a few feet away, saw the punching, and did nothing to protect her patient, even after Plesh turned to her as the supervising nurse and said "Did you see that?"  In addition, the jury could have found that Wiegers told Davis in the moments after the incident: "This is what you get."

Furthermore, a punitive damages award may be "justified not only by defendants' actions on [the date in question] but also by their subsequent behavior."  Hall v. Ochs, 817 F.2d 920, 927 (1st Cir. 1987).  Here the jury could have found that Wiegers tried to cover up the assault by writing "Unknown when or how injury sustained" and

"Unknown to writer precipitants to occurrence" in her report of the incident. Similarly, the jury could have found that Fitpatrick and Gillis were trying to cover up their own wrongdoing when they filed a groundless complaint against Plesh for allegedly twisting Davis's handcuffs. Finally, the jury could have found that Wiegers, Fitzpatrick, Gillis, Hanlon, and Rennie lied when they testified that they did not see Bragg punch Davis, unlike Tassone, who admitted that he saw the punching take place and was spared by the jury from an award of punitive damages. Comparing the testimony of these appellants with the testimony of Davis, Plesh, and Tassone, "a factfinder might infer that the stark clash could not have resulted from innocent misrecollection and that its intentional quality intensified any need the jury may have found for punishment and deterrence." Id. at 928.

Relying on Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999), the appellants also argue that the evidence does not support a finding that they "acted with any conscious perceived risk that they would violate Mr. Davis's constitutional rights." In Kolstad, the Supreme Court held that "[t]he special showing needed to trigger eligibility for punitive damages . . . 'evil motive' or 'reckless or callous indifference' . . . pertains to the defendant's 'knowledge that [he] may be acting in violation of federal law, not [his] awareness that [he] is engaging in discrimination.'" Iacobucci, 193

F.3d at 26 (internal citation omitted) (quoting Kolstad, 527 U.S. at 535). Not surprisingly, since Kolstad was decided after the trial in this case, the trial judge did not give an instruction tying the evil motive or indifferent state of mind finding to a violation of Davis's civil rights, and the appellants did not object to the omission. We review for plain error and find that this is not "the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings." Toscano, 934 F.2d at 385 (citation and internal quotation marks omitted). We note that our conclusion "is consistent with post-Kolstad opinions from other courts, none of which have required a new trial under its standards after a jury considered the issue pre-Kolstad." Rubinstein v. Admins. of the Tulane Educ. Fund, 218 F.3d 392, 406 n.7 (5th Cir. 2000) (collecting cases) (internal quotation marks omitted).

Pursuant to other recent authority from the Supreme Court, we review de novo whether the proportionality between punitive damages and compensatory damages is constitutional. Cooper Indus., Inc., v. Leatherman Tool Group, Inc., __ U.S. __, 121 S. Ct. 1678, 1685-86 (2001). In assessing the reasonableness of a punitive damages award, we consider "(1) the degree of reprehensibility of a defendant's conduct; (2) the ratio between punitive and actual and potential damages; and (3) a comparison of the punitive damages figure and other civil and criminal penalties imposed for comparable conduct." Romano

v. U-Haul Int'l, 233 F.3d 655, 672-73 (1st Cir. 2000) (citing BMW of North Am., Inc. v. Gore, 517 U.S. 559, 574 (1996)); see also Zimmerman v. Direct Fed. Credit Union, __ F.3d __, __ (1st Cir. 2001) [No. 01-1007, slip op. at 23].

Here, each of the BMW criteria is easily satisfied. First, the "level of reprehensibility of appellants' alleged misconduct is 'perhaps the most important indicium.'" Romano, 233 F.3d at 673 (quoting BMW, 517 U.S. at 575). For the reasons we have discussed, the misconduct of each of the appellants was reprehensible enough to justify the award against him or her.

Second, the punitive damages award was reasonable in comparison to the compensatory damages award. After remittitur, Fitpatrick, Gillis, and Hanlon will pay $50,000 each in punitive damages, Rennie will pay $125,000, and Wiegers will pay $250,000, compared to $100,000 in compensatory damages. Even if we include the $500,000 award against Bragg and consider the total punitive damages award of $1.025 million in the aggregate, the ratio between Davis's punitive and compensatory damages is about 10 to 1. In Romano, we upheld a 19 to 1 ratio between punitive and compensatory damages, noting that the Supreme Court has "dismissed any simple, mathematical formula in favor of general inquiry into reasonableness." 233 F.3d at 673. Here, the evidence supports a finding of significant actual and potential harm. According to Dr. Zeidman, the psychological harm

Davis has suffered from the incident has seriously affected his quality of life, causing a range of PTSD symptoms, demonstrating the reasonable relationship between the injury and the amount of the award.

Finally, we consider the third BMW factor requiring us to assess the punitive damages award "in light of the complex of statutory schemes developed to respond to the same sort of underlying conduct." Zimmerman, slip op. at 26. In making this assessment, the correct comparison is to other statutes and regulations proscribing the same conduct and then to decided cases. Id. at 27. "Moreover, a reviewing court should search for comparisons solely to determine whether a particular defendant was given fair notice as to its potential liability for particular misconduct, not to determine an acceptable range into which an award might fall." Id. Since § 1983 does not address damage amounts, we consider whether the awards we have allowed to stand in other § 1983 cases give fair notice of the award here, and find that they do. See Nydam v. Lennerton, 948 F.2d 808, 811 (1st Cir. 1991) (affirming two awards of $100,000 each in punitive damages for excessive force claim); Gutierrez-Rodriquez v. Soto, 882 F.2d 553, 580-81 (1st Cir. 1989) (affirming total award of $600,000 in punitive damages for police shooting); Hall, 817 F.2d at 927 (affirming total award of $200,000 in punitive damages for battery, false arrest, and imprisonment claims).

## III.

For the foregoing reasons, we affirm the judgment against all of the appellants.

**<u>Affirmed.</u>**